## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC., TEVA    )
PHARMACEUTICALS INTERNATIONAL       )
GMBH, AND CEPHALON, INC.,            )
                                     )
          Plaintiffs,             )
                                     )   C.A. No. 18-1074-CFC
        v.                      )
                                     )
HOSPIRA, INC.,                       )
                                     )
          Defendant.              )

## DECLARATION OF ANNE ELIZABETH CHRISTOPHER

I, Anne Elizabeth Christopher, declare that I am a barrister and solicitor admitted to practice and in good standing in the state of Victoria and my name also appears on the register of practitioners for the High Court of Australia. I have been admitted to practice law since 1997. I am also registered as an Australian Trade Mark attorney. I am currently employed as Senior Counsel, IP, by Pfizer Australia Pty Ltd (a subsidiary of Pfizer Inc., which is Hospira's parent). My office is at our facility in Mulgrave, Victoria, Australia. I submit this Declaration based on personal knowledge and state as follows:

1.      Prior to joining Hospira Australia Pty Ltd in March 2010 as in-house counsel, I was employed in law firms and patent and trade mark attorney firms in Australia and the UK since 1996. My time in private practice included working for a specialist IP firm in Australia for over 8 years in all forms of IP dispute resolution, and additionally in the IP departments of two law firms in London (Clifford Chance LLP and CMS Cameron McKenna LLP). In September 2015, Pfizer Inc completed its acquisition of Hospira, Inc. (being the parent company of Hospira Australia Pty Ltd). While employed by Hospira, I had global responsibility for IP work related

to the products allocated to me, including any patent litigation for those products around the world.  This continues now that I am employed by Pfizer.

2.      Regarding education, I obtained a Bachelor of Science and Bachelor of Laws (Hons) from the University of Melbourne and completed the requirements of my degrees in 1995.

3.      I was admitted to practice as a barrister and solicitor of the Supreme Court of Victoria and the High Court in 1997.  I was registered as an Australian Trade Mark attorney in 1999.  I complete ongoing legal training as required for maintaining a practicing certificate in Victoria, and this includes ethics training. I take my ethical responsibilities seriously.

4.      In my current role I have responsibility for managing global patent litigation relating to certain of Hospira"s/Pfizer's drug products or proposed drug products, as well as advising in relation to intellectual property issues where they converge with regulatory issues for these drug products.  I conduct and direct patent freedom to operate evaluations and analyses, and supervise outside counsel in connection with patent litigation in which Hospira/Pfizer are involved.

5.      I am not an officer or executive, nor do I serve on the Board of Directors for Pfizer or any of its subsidiaries.  I will not have any future involvement in the prosecution of any patents relating to bendamustine as specified in the proposed Protective Order.

6.      I am not involved in competitive decision-making relating to the sales, marketing, advertising, or pricing of drug products. I do not conduct scientific research.  I am not involved in decisions related to which customers to target for our products.  I am not involved in decisions for setting prices for any products.

7.      In the present action, I am the in-house litigation counsel responsible for overall case strategy and management of the matter.  I report to Leah Taylor.  In this role, I am in communication with Ms. Taylor and outside counsel several times a week as required, and generally at least once a week.

8.      The patent issues related to the liquid bendamustine product at issue in this lawsuit have been my and Leah Taylor's responsibility for many years, since about 2013.  I was also responsible for Hospira's ANDA for lyophilized bendamustine product, beginning in 2010.

9.      Relevant here, in January 2019, the FDA granted tentative approval of Hospira's liquid bendamustine product at issue in this litigation.  Broadly speaking, the FDA's tentative approval is clearance to market the product in the United States, but for the existence of the patent rights and regulatory exclusivities which block final approval.  That means that the FDA has reviewed Hospira's New Drug Application for the liquid bendamustine product, including its proposed manufacturing process, formulation and all other technical aspects of the product that relate to our proposed product, and is withholding final approval subject to Plaintiffs' patent rights and regulatory exclusivities.

10.     I understand that Plaintiffs' are concerned about inadvertent disclosure of confidential and highly confidential information related to product design and manufacturing.  First, I have acted pursuant to duties subject to protective orders for many years and I take my role very seriously as a lawyer and officer of the court.

11.     In addition, Hospira's New Drug Application with respect to the liquid bendamustine product at issue in this case was developed without any of Plaintiffs' Confidential or Highly Confidential information (this lawsuit had not begun when we designed our product), and the FDA tentatively approved that product.  Changes to the approved product or its

3

manufacture could cause issues with FDA's tentative approval or delay any future final approval. Therefore, Hospira is not incentivized to change its already-approved product. This mitigates against any possible risk of inadvertent disclosure issues on product design that the Plaintiffs may have.

12.     I serve as a critical part of the litigation team representing Hospira in this matter. To date in the present action, I have participated in litigation strategy discussions with outside counsel. Consistent with my oversight role, I review and comment on briefs, pleadings, contentions, hearing preparation outlines, expert selection, and discovery. I participate in and facilitate communication between outside counsel and Hospira/Pfizer employees around the world on issues related to this litigation, including issues relating to document collection and review.

13.     I anticipate that, moving forward, my role will further include interacting with relevant Hospira/Pfizer personnel in response to Plaintiffs' discovery requests, assisting with the preparation of Hospira/Pfizer personnel for deposition, selection and preparation of Rule 30(b)(6) witnesses, reviewing case documents, further developing litigation strategies and presentations, including for the claim construction hearing and trial, and participating in and directing any settlement discussions.

14.     More specifically, as part of the litigation team, I expect, if permitted, to assist in the analysis of Plaintiffs' infringement allegations, including the technical information that Plaintiffs rely on to support its infringement claims, such as documentary evidence, expert evidence, and deposition testimony, to further develop any defenses.

15.     If I were unable to perform the functions described in the previous paragraphs, it would be a significant hardship for Hospira/Pfizer. My duties would be curtailed,

communication with outside counsel would decrease and Hospira's/Pfizer's legal spend would increase.  I would not be permitted to provide valuable instructions to outside counsel or direct strategic decisions.

16.     As an example, Leah Taylor and I would normally be involved in providing our business with advice in relation to how we see the strength or weakness of the patentee's claims impacting the ability of competitors to launch in the future.  This analysis would be based on internal Pfizer/Hospira information and public information.  Thus, our activity in advising the business on potential competitor launches presents a very low, if not non-existent, risk for the inadvertent disclosure of Plaintiffs' confidential information, yet it could be viewed as falling within the broad and vague definition of prohibited competitive decision making proposed by Plaintiffs.

17.     I would like to be able to have clarity on the scope of the Protective Order so that Leah Taylor and I are able to perform our roles whilst being confident we are not in breach. If we are not clear about the scope of the Protective Order, or in fact were not able to see certain materials at all, this would effectively remove client oversight of this litigation, and Hospira/Pfizer would effectively be put in the position where our external lawyers would be making decisions on behalf of the company without our input.

18.     I am located at the Australian facility where the bulk of the development work on the accused product took place before this litigation began.  I, along with my colleague Leah Taylor, am uniquely familiar with the history of this product, its development and the product design.  Our role with regard to this product assumed from the start that, because of our knowledge and experience with the product, we would be an integral part of the litigation team if patent litigation arose.  Hospira/Pfizer is harmed if I am not able to fully participate in the

litigation, especially as an officer of the court who agrees to sign and abide by a Protective Order.

19.     Although there may be other examples in the future, there is already one instance where Plaintiffs have taken the position that only outside counsel may see information that directly impacts my legal role: infringement contentions.  Plaintiffs assert that certain information they rely on in their contentions that *Hospira* infringes their patent cannot be viewed by in-house counsel.  It would be extremely difficult for in-house counsel to advise outside counsel on the identification of information relevant to rebutting Plaintiffs' infringement claims if we cannot see the underlying evidence.  It will also make it extremely difficult for Leah Taylor and I to advise Hospira/Pfizer on the strength and weaknesses in Plaintiffs' case if we cannot see and fully understand the infringement contentions.

20.     Further, I expect that Plaintiffs will rely on secondary considerations of non-obviousness to rebut Hospira's obviousness proofs.  Patent plaintiffs commonly rely on commercial information for proofs in this regard.  Plaintiffs here are likely to mark this information, and any expert reports and depositions relying on it, as Highly Confidential.  If I cannot review that information, I will not be able to effectively communicate with outside counsel regarding our response, including: selection of experts, expert deposition strategy, potential *Daubert* motions, trial presentations and the like on these issues.

21.     Similarly, should the need arise, later on in the case, to consider whether to launch at risk (which is unlikely, given the regulatory exclusivities will not expire until December 2022—a year after trial is scheduled in this matter), it is essential that in-house counsel be able to advise the business on the strength of the litigation, the chances of prevailing on a preliminary injunction decision and the potential costs of launching at risk.  I can do this without disclosing

6

confidential or highly confidential information.  If I cannot review Plaintiffs' evidence of its

alleged harm and potential damage as well as the other information Plaintiffs may rely on in a

preliminary injunction proceeding, I would not be able to assess the strength of

Hospira's/Pfizer's case or the significance of the risks we would face if we launched before this

litigation is concluded.

22.     Since joining Hospira in March 2010, I have assisted in the prosecution and

management of many patent litigations in the United States in which Hospira or Pfizer was a

party.  In many of these actions (where we reached discovery), I have received access to all

discovery material produced by the opposing party pursuant to an applicable protective order.  In

rare cases where I have not been able to review all materials, my role has been hampered.  I am

aware of my responsibilities and requirements regarding non-disclosure of confidential materials,

and I have performed them effectively for almost a decade as an in-house counsel.

23.     When I agree to be bound to the terms of a Protective Order, I take my obligations

seriously and expect others to do the same.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true

and correct.

Executed on the 24th day of March, 2020        *Anne Christopher*                                
                                               Anne Christopher
                                               Senior Counsel, IP
                                               Pfizer Australia Pty Limited